## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HARRIET A. AMES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 13-00629 (ESH) |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HOMELAND SECURITY, et al., ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION

Plaintiff Harriet A. Ames brings this action alleging that the United States Department of Homeland Security ("DHS") and the United States Department of Defense violated her rights under the Privacy Act, 5 U.S.C. § 552a, by unlawfully disclosing DHS's investigative report on plaintiff's past misconduct to her subsequent employer, the National Geospatial-Intelligence Agency ("NGA"). (Compl. ¶ 1, May 2, 2013 [ECF 1].) Before the Court is defendants' Motion for Summary Judgment. (Defs' Mot., July 2, 2015 [ECF 49].) As explained herein, defendants' motion will be granted.

### BACKGROUND

In October 2008, plaintiff began working for the Federal Emergency Management Agency ("FEMA") of DHS as a GS-13 personnel security specialist. In September 2009, plaintiff was selected to be Acting Branch Chief of the Personnel Security Branch. She was subsequently promoted to Branch Chief (GS-14) in October 2010. The Personnel Security Branch is responsible for conducting suitability and national security checks for permanent full-time employees, On-Call Response Employees, Disaster Assistant Employees, contractors, affiliates, and interns at FEMA. As Branch Chief, plaintiff was personally responsible for

adjudicating and granting high level security clearances, including Top Secret with Sensitive Compartmented Information access.

On August 1, 2011, Senior Special Agent K.C. Yi of the DHS Office of Inspector General ("DHS OIG") interviewed plaintiff as part of an active investigation of FEMA's Chief Security Officer and plaintiff's supervisor, Burt Thomas.  The investigation of Mr. Thomas determined that he appeared to have engaged in a conflict of interest when he hired Gary Walker and James Bland as supervisory fraud investigators while Walker and Bland were the owners of a FEMA vendor, and that Mr. Thomas provided false statements to DHS OIG regarding his knowledge of their criminal histories.

Agent Yi subsequently initiated and conducted a separate investigation of plaintiff.  The investigation ultimately determined that she had also provided false statements to DHS OIG, and that she appeared to have violated security standards in favorably adjudicating security clearances for Walkers and Bland, both of whom had criminal records.  Specifically, the investigation found that, at the time of her interview, plaintiff had detailed knowledge of Mr. Walker's past criminal conviction—information which was material to the OIG's investigation—but denied knowing anything about it.  The inquiry additionally determined that plaintiff may have provided false information or lacked candor when she had been previously interviewed by an Office of Personnel Management investigator as part of Mr. Bland's official background investigation for a security clearance—information which was considered material to the OPM investigation and was used to assist in determining Bland's suitability for FEMA employment.  Finally, the investigation concluded that plaintiff failed to follow DHS policy and federal regulations when she approved national security clearances for both Walker and Bland.

On February 15, 2012, DHS OIG presented the investigative findings to the U.S. Attorney's Office for the District of Columbia, which declined criminal prosecution in favor of administrative remedies. On February 16, 2012, DHS OIG conducted a second interview with plaintiff and gave her formal notice that she was the subject of an investigation. During the interview, plaintiff admitted in a sworn statement that she had granted interim Secret security clearances regardless of whether positions were designated Special Sensitive, in violation of DHS and Director of National Intelligence regulations, guidelines, and policies. (Defs' Mot., Ex. 3F, Plaintiff's February 16, 2012 Sworn Statement, at 8.)

The same day, February 16, 2012, plaintiff submitted her two-week notice of resignation from FEMA, which took effect on February 24, 2012. Two days later, plaintiff started working as the Division Chief of Personnel Security (GS-15) at NGA, another agency in the government intelligence community, which is located within the Department of Defense.

On May 31, 2012, DHS OIG issued its Report of Investigation. (Defs' Mot., Ex. 3, DHS OIG Report of Investigation ("Report").) When Agent Yi learned that plaintiff had accepted the position at NGA, he became concerned that plaintiff posed a national security risk, in view of DHS OIG's conclusion that she had provided false information to investigators and violated various national security regulations. (*See* Report at 6 (citing violations of 5 C.F.R. §§ 732.202(a)(2)(i) (waivers and exceptions to investigative requirements), 731.104(b)(2) (appointments subject to investigation), and 731.202 (suitability standards for security clearance and pre-employment checks).) On July 11, 2012, Agent Yi emailed his supervisor, Special Agent James Izzard, as well as Danielle Blue at the Personnel Security Division, and Kimberly Lew (Blue's supervisor) to discuss his concerns that plaintiff had "hopped" agencies before her clearance could be revoked. Agent Yi wrote:

> One of the concerns that came up during the investigation is that federal employees can hop agencies knowing that their clearance was about to be revoked, and thus no action is taken once they leave that particular agency. The employee's new agency never finds out about the clearance issue because the revocation is not in the system. This occurred with Gary Walker when he left Department of Transportation OIG under threat of termination and his clearance was not revoked. FEMA-OCSO, in particular, Harriet Ames, used this as an excuse to grant him a TS clearance based on reciprocity.

(Defs' Mot. at 8) (quoting Agent Yi email).

Ms. Lew responded that the Personnel Security Division had taken no actions prior to plaintiff's departure from FEMA, although her office "would have initiated a security clearance action," and recommended that "since this information may have a bearing on Ms. Ames['s] employment," that the DHS OIG office "would forward/share this with the OIG of the agency in which she is now employed."  (Defs' Mot. at 8-9.)

 On July 13, 2012, Agent Yi contacted his counterpart in the Office of Inspector General for NGA, Special Agent Heather K. Alexander, and disclosed the contents of the Report by telephone.  He also mentioned that DHS OIG would provide a copy of the Report upon receipt of a formal request.  On July 13, 2012, NGA formally requested the Report.  Agent Yi forwarded NGA's request to Richard Doery, Assistant Counsel for the DHS OIG Office of Counsel, and Special Agent Izzard to review any possible privacy law concerns related to disclosure of the Report.  On July 17, 2012, NGA initiated its own investigation into whether plaintiff had made false statements.  On July 18, 2012, Agent Yi emailed Investigator Alexander to explain that DHS OIG Office of Counsel's review would delay official disclosure of the Report.

On August 30, 2012, Agent Yi sent the Report to NGA in a series of four emails. NGA subsequently terminated plaintiff's employment.  On May 2, 2013, plaintiff initiated this action alleging that defendants violated her rights under the Privacy Act.  Defendants moved for summary judgment on July 2, 2015.  Plaintiff filed her Opposition to defendants' Motion for

Summary Judgment on September 24, 2015.  (Pl's Opp'n, September 24, 2015 [ECF 67].)  Defendants filed their Reply on November 10, 2015.  (Defs' Reply, Nov. 10, 2015 [ECF 74].)

## ANALYSIS

### I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a motion for summary judgment shall be granted if the pleadings, discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the non-moving party."  *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (quoting *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012)) (internal citation marks omitted).  To defeat a summary judgment motion, however, "the non-movant must do more than simply show that there is some metaphysical doubt as to the material facts; [i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Gibbs v. Washington Metro. Area Transit Auth.*, 48 F. Supp. 3d 110, 121 (D.D.C. 2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-250 (1986).

### II. THE PRIVACY ACT

When it passed the Privacy Act, Congress declared that "in order to protect the privacy of individuals identified in information systems maintained by federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies." Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896.  The Act provides agencies with "detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements."  *Doe v. Chao*, 540 U.S. 614, 618 (2004).  These

provisions for relief "protect [] individuals from injury that can result from the bureaucratic habit of collecting and retaining information, however dated, prejudicial, or false." *Dickson v. Office of Pers. Mgmt.*, 828 F.2d 32, 38 (D.C. Cir. 1987); *see also McCready v. Nicholson*, 465 F.3d 1, 7-8 (D.C. Cir. 2006) (quoting *Bartel v. FAA*, 725 F.2d 1403 (D.C. Cir. 1984) ("Put simply, the Act safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records…by allowing an individual to…ensur[e] that his records are accurate and properly used.")

Plaintiff seeks recovery of damages under Section (g) of the Act, which creates a cause of action for an agency's violation of the Act. *See* 5 U.S.C. § 552a(g)(D). Plaintiff argues that defendants violated Section 552a(b), which forbids disclosure of "any record which is contained in a system of records by any means of communication to any person, or to another agency, except…with the prior written consent of [] the individual to whom the record pertains." To prevail, plaintiff must prove four elements: "1) the disclosed information is a 'record' contained within a 'system of records'; 2) the agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4) the disclosure adversely affected the plaintiff." *Reed v. Dep't of the Navy*, 910 F.Supp. 2d 32, 40 (D.D.C. 2012) (citing *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 154 (D.D.C. 2004)); *see also Doe v. Dep't. of Justice*, 660 F. Supp. 2d 31, 44-45 (D.D.C. 2009). "The burden of proof lies with the plaintiff." *Doe*, 660 F. Supp. 2d at 45 (citing *Reuber v. United States*, 829 F.2d 133, 141 (D.C. Cir. 1987).

Defendants do not contest that the DHS OIG Report disclosed by Agent Yi was a "record" contained within a "system of records." They instead argue that the disclosure was legally proper under multiple exemptions. The Privacy Act recognizes 12 exemptions to the disclosure-without-consent rule, including for "routine use[s]." 5 U.S.C. 552a(b)(3). A routine

use is defined as a disclosure of a record "for a purpose which is compatible with the purpose for which it is collected." 5 U.S.C. § 552a(a)(7); *see also Budik v. United States*, 949 F. Supp. 2d 14, 28 (D.D.C. 2013). An agency is also required to publish in the Federal Register notice of the types of disclosures that it may make pursuant to the "routine use" exemption. 5 U.S.C. §§ 552a(b)(3), 552a(e)(4)(D). Defendants may therefore successfully invoke the routine use exemption only by demonstrating both "compatibility" and "publication" of the specific routine use exemption. *See Reed*, 910 F. Supp. 2d at 41; *Radack v. U.S. Dep't of Justice*, 402 F. Supp. 2d 99, 105 (D.D.C. 2005).

Given the facts as plaintiff presents them, the Court concludes that DHS OIG's disclosure of the Report was compatible with the use for which the Report was created and that it fell within two published routine uses: Law Enforcement (Routine Use G) and National Security (Routine Use H). The disclosure was therefore proper as a matter of law.

**A. Compatibility**

Compatibility of disclosure and collection must exist independent of a given agency's published routine uses. The compatibility requirement was intended to prevent the "unnecessary exchange of information to another person or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material." *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, reprinted in* 120 Cong. Rec. 40405, 40406 (1974).

To assess compatibility, a court must conduct a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548-49 (3rd Cir. 1989). Where a "concrete relationship or similarity, some meaningful degree of convergence" exists "between the disclosing agency's purpose in gathering the information and in its disclosure," compatibility is satisfied. *U.S. Postal*

7

*Service Service v. National Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 145 (D.C. Cir. 1993) (quoting *Britt*, 886 F.2d at 549-50).[1]

Defendants meet the compatibility prong of the routine use exemption, and indeed, plaintiff does not appear to contest the issue, independent of her individual arguments on the specific routine uses. DHS OIG and Agent Yi prepared the Report on plaintiff in order to determine if there had been misconduct by a government employee in a national security position. OIG's interest, of course, was to inquire into whether additional action was necessary to prevent violations from occurring at an important gate-keeping function: the issuance of security clearances to government personnel. OIG's purpose in *disclosing* the Report was precisely the same: to prevent such misconduct by that individual at another national security agency. There is little doubt, therefore, that there is a "concrete relationship" between OIG's purpose in creating the record of investigation and its purpose in sharing that record of misconduct with another agency's OIG: both were motivated by the need to determine whether plaintiff's government employment responsibilities would need to be curtailed.

The fact that one government agency created the record of misconduct and then disclosed it to a separate government agency does not defeat compatibility. *See Radack*, 402 F. Supp. 2d at 106 (OIG's decision to turn over plaintiff's record of misconduct to state bar authorities was "precisely in accordance with the purpose for which it was collected" and "easily met" the compatibility requirement because the investigation was conducted "to provide for the resolution

---

[1] The precise definition of "compatibility" has not been independently established in this Circuit. *See Doe*, 660 F. Supp. 2d at 47 n.7. Although the *U.S. Postal Service* opinion declined to establish a detailed linguistic test for the D.C. Circuit, it did indicate general agreement (outside the labor relations context) with the "meaningful convergence" and "concrete relationship" test employed by the Third Circuit's *Britt* decision. *See U.S. Postal Service*, 9 F.3d at 145.

of allegations of misconduct"); *Reed v. Dep't of Navy*, 899 F. Supp. 2d 25, 33 (2012).[2] In *Reed*, for example, the Navy investigated allegations of misconduct by a service member and then shared the findings of the military investigation with the individual's other employer, a local police department. This Court found that the purpose of record collection and disclosure were sufficiently compatible because they both addressed the individual's "fitness for duty." It rejected plaintiff's argument that an individual's fitness as a member of the military entailed different parameters than fitness as a civilian police officer. *Reed*, 899 F. Supp. 2d at 33.

Similarly, Agent Yi and DHS OIG created the Report on plaintiff's misconduct to address her fitness to serve in a position involving national security, and the Report was disclosed to NGA OIG in accordance with that same purpose.

### B. Routine Use G—Law Enforcement

In addition to compatibility, defendants must demonstrate publication of "routine use" exemptions. The DHS publishes multiple routine use exemptions in the Federal Register. The Court finds that the disclosure was proper under at least two of these routine uses.

The "Law Enforcement" Routine Use, or Routine Use G, allows disclosure:

> To an appropriate Federal, State, tribal, local, international, or foreign law enforcement agency or other appropriate authority charged with investigating or prosecuting a violation or enforcing or implementing a law, rule, regulation, or order, where a record, either on its face or in conjunction with other information, indicates a violation or potential violation of law, which includes criminal, civil, or regulatory violations and such disclosure is proper and consistent with the official duties of the person making the disclosure.

74 Fed. Reg. 55569-01(G) (Oct. 28, 2009).

---

[2] Although the Court in *Reed* was able to find compatibility as to one individual's disclosures in the case, it did not rule for defendant on summary judgment because facts remained in dispute with regard to a separate individual's disclosures. *Reed*, 899 F. Supp. 2d at 33.

Here, the disclosure was made by one law enforcement agency (DHS) to another law enforcement agency (NGA). It is undisputed that the DHS OIG Report "indicate[d] a violation or potential violation of law." *Id.* The Report found that plaintiff had made false statements to investigators and failed to follow numerous DHS guidelines and regulations when she approved national security clearances for employees with criminal backgrounds. (*See* Report at 5 (citing 5 C.F.R. §§ 732.202, 731.104(b)(2), 731.202).) Indeed, plaintiff admitted that she knowingly granted interim Secret clearances to new employees hired for positions designated Special Sensitive, in contravention of DHS policy requiring pre-employment checks for such positions. (*See* Defs' Mot., Ex. 3F, Plaintiff's February 16, 2012 Sworn Statement, at 8.)

In *Reed*, this Court held that a law enforcement routine use exemption with similar wording applied where a Navy investigator disclosed information relating to plaintiff's various military code violations to the plaintiff's civilian employer. 910 F. Supp. 2d at 44. The cases are quite similar—after the Navy investigators disclosed their investigation's findings of past misconduct in the military, the police department conducted its own investigation, which yielded additional disclosures of misconduct.[3] *Id.* at 37. The Court in *Reed* held that, even though the police department "would not be charged with the responsibility of investigating or prosecuting plaintiff's military code violations" or past criminal acts, the law enforcement exemption still applied. *Id.*

Moreover, disclosure of the Report was "proper and consistent with the official duties of" DHS OIG and was made to NGA OIG, an "appropriate authority charged with investigating" such misconduct. 74 Fed. Reg. 55569-01(G). The Inspector General Act of 1978 describes the

---

[3] In this case, NGA's independent investigation confirmed the false statements disclosed by the DHS OIG Report, but also found additional evidence that plaintiff was conducting a personal business using government resources. (Defs' Mot., Ex. 4, NGA OIG Report, at 17.)

duties of OIG offices "[t]o…conduct…and coordinate audits and investigations relating to programs and operations of" the relevant agency and "[t]o conduct, supervise or coordinate relationships between such [agency] and other Federal agencies…with respect to…the identification and prosecution of participants in…fraud or abuse." The Inspector General Act of 1978, 5 U.S.C.A. App. 3, § 4(a)(4). DHS OIG had the authority to investigate whether to take disciplinary action against plaintiff, but she resigned before any such action could be taken. Given that NGA OIG also possessed the law enforcement authority to investigate potential violations of law, the coordination provision of the Inspector General Act made communication perfectly appropriate.[4]

Disclosure of the Report therefore fell comfortably within the scope of Routine Use G because the Report indicated violations of law, and the disclosure was properly made to a party charged with investigative authority. 74 Fed. Reg. 55569-01(G).

### C. Routine Use H—National Security

The disclosure was also proper under the National Security Routine Use (or Routine Use H), which allows disclosure:

> To a Federal, State, or local agency, or other appropriate entity or individual, or through established liaison channels to selected foreign governments, in order to provide intelligence, counterintelligence, or other information for the purposes of intelligence, counterintelligence, or antiterrorism activities authorized by U.S. law, Executive Order, or other applicable national security directive.

74 Fed Reg. 55569-01(H).

As a member of the Intelligence community, the NGA is a "combat support agency of the Department of Defense" that provides "geospatial intelligence" for the United States government

---

[4] Plaintiff insists that defendants' argument relies upon the contention that the Inspector General Act somehow supersedes the Privacy Act. (Pl's Opp'n at 23.) That misconstrues the relevance of the Inspector General Act, which simply makes clear that the OIG offices are appropriate authorities to investigate misconduct pursuant to Routine Use G.

11

and receives support from the Central Intelligence Agency. 10 U.S.C. §§ 441(a), 444. It would make sense for Routine Use H to contemplate disclosures to the NGA regarding the fitness of NGA employees for security clearances, given how instrumental such sensitive security positions are to NGA's mission to support the intelligence community. Routine Use H is also supplemented with other clearly published notices that an employee's qualifications for access to classified information is subject to re-assessment.

The clearance process for determining access to classified information is governed by Executive Order 12968, 60 Fed. Reg. 40245 (Aug. 2, 1995) ("EO 12968"), which establishes an elaborate system of classification designed to protect the national security interests of the United States. Of particular note is Section 1.2(d), which states that "all employees shall be subject to investigation by an appropriate government authority…any time during the period of access to ascertain whether they continue to meet the requirements for access." *Id.* § 1.2(d); *see also* 5 C.F.R. § 731.104(b)(2) ("An appointment to a covered position also will be subject to investigation when…an agency obtains new information in connection with the person's appointment that calls into question the person's suitability under [classified information access regulations].") The language of Executive Order 12968 is sweeping: "in determining eligibility for access under this order, agencies may investigate and consider *any* matter that relates to the determination of whether access is clearly consistent with the interests of national security." EO 12968 §3.1(d) (emphasis added). The Executive Order gives clear notice that "[e]mployees who are eligible for access to classified information…may also be reinvestigated if, at any time, there is reason to believe that they may no longer meet the standards for access established in this order." *Id.* § 3.4(b).

Significantly, Executive Order 12968 also imposes affirmative duties on all covered employees to "report all violations of security regulations to the appropriate security officials." *Id.* § 6.2(a). "Employees are encouraged and *expected* to report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security." *Id.* § 6.2(b) (emphasis added). The reporting requirement in Executive Order 12968 represents such a uniquely important national security interest that the D.C. Circuit has narrowly interpreted the scope of Title VII liability that can be triggered by such reporting, in order to prevent a chilling effect. *See Rattigan v. Holder*, 689 F.3d 764, 769 (noting that "the likely chilling effect" of full Title VII liability presents problems because the national security employees "need all the evidence they can get to control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to…[have] access to such information.") As the *Rattigan* Court explained: "The Executive Order encourages broad reporting precisely because the entities charged with making security clearance decisions…need full access to even unsubstantiated and doubtful information in order to make …sensitive, predictive judgments" and "broad liability for such reporting could compromise the integrity of decisions." *Id.* at 770-771.

This Court believes that a crabbed reading of Routine Use H would have the same chilling effect on security clearance-related reporting as *Rattigan* contemplated in the Title VII context. While the Court acknowledges that Title VII includes an explicit statutory exemption for national security, 42 U.S.C. § 2000e-(2)(g), in contrast to the Privacy Act, the Supreme Court and D.C. Circuit have made clear that the judiciary should exercise the utmost caution in interfering with national security agencies' adjudication of matters related to security clearances. *See Department of Navy v. Egan*, 484 U.S. 518, 529 (1988) ("The Court accordingly has

acknowledged that with respect to employees in sensitive positions 'there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information.'") (quoting *Cole v. Young,* 351 U.S. 536, 546, (1956)); *Rattigan,* 689 F.3d at 769; *Bennett v. Chertoff*, 425 F.3d 999, 1003 (D.C. Cir. 2005) (holding that, where an employee was fired from the Transportation Security Administration after failing to receive a security clearance, the court "[could] not adjudicate the credibility of the claim" that the firing was pretextual because it was not qualified to "evaluate the validity of the agency's security determination"); *Ryan v. Reno,* 168 F.3d 520, 523 (D.C. Cir. 1999) (holding that *Egan* applies to Title VII claims and bars judicial resolution of "a discrimination claim based on an adverse employment action resulting from an agency security clearance decision").

The national security interest mandated in Executive Order 12968 not only made Agent Yi's disclosure consistent with Routine Use H, but also required it. His investigation had found that plaintiff had committed numerous violations of DHS security policies and regulations. Pursuant to Executive Order 12968 and in accordance with his duties as a member of the DHS OIG, Agent Yi determined that such information warranted consideration at plaintiff's new agency.[5] Even setting aside Agent Yi's legal obligations, common sense dictated that the DHS

---

[5] Plaintiff emphasizes in her Opposition that matters pertaining to Agent Yi's credibility are in factual dispute. (Pl's Opp'n at 3-8.) For example, she argues that Agent Yi could not have thought that she was "agency-hopping" to elude disciplinary action at DHS, given the timing of plaintiff's hiring at NGA. (*Id.* at 4). Plaintiff's concerns over Agent Yi's veracity are irrelevant for two reasons. First, Agent Yi's precise motivation in disclosing the Report to NGA is not material to whether the disclosure fell within a routine use exemption. The Report found, and plaintiff admitted to, multiple violations of security policies and regulations and Agent Yi communicated the records of those violations to another agency. Whether Agent Yi was genuinely convinced that plaintiff resigned her FEMA position in order to avoid disciplinary

OIG's findings should be communicated to plaintiff's new employer given its place in the intelligence community. NGA was thus an "appropriate entity" to receive such a disclosure, and the communications were properly authorized by multiple laws, including the Inspector General Act, Executive Order 12968l, and U.S. intelligence regulations.

In the Court's view, plaintiff had sufficient notice that information relating to her suitability for a sensitive national security position could be disclosed between agencies. In addition to the published text of Routine Use H, the notices and directives of broad investigatory powers in Executive Order 12968 and related security clearance regulations make it clear that national security agencies enjoy wide latitude to share, question, and analyze information that is relevant to one's fitness for positions requiring security clearance.

DHS OIG's disclosure of the Report to NGA OIG therefore fell within both the law enforcement (Routine Use G) and national security (Routine Use H) exemptions. As a result, its disclosure was proper as a matter of law.[6]

---

action does not affect the improper disclosure analysis. Second, plaintiff's contentions as to Agent Yi's credibility address the willfulness element of a Privacy Act violation, (*see* Pl's Opp'n at 14 ("The record contains material disputes of fact whether Yi intentionally and willfully violated the Privacy Act."), which the Court does not rely upon to reach its conclusion. *See* n. 6, *infra*.

[6] Because the Court finds that plaintiff cannot satisfy the improper disclosure requirement of the Privacy Act, it need not reach the issues of willfulness or adverse effect. Given that plaintiff had sought to compel additional deposition testimony from Agent Yi only with regard to the willfulness element (*see* Pl's Mot. to Compel at 5), the Court concludes that plaintiff's Objections to the Magistrate Judge's Ruling on the Motion to Compel Deposition Testimony (Oct. 19, 2015 [ECF 70]) have no bearing on the Court's opinion. Nevertheless, the Court notes its agreement with Magistrate Judge Kay's ruling denying the Motion to Compel. As Magistrate Judge Kay noted, the allegations of misconduct by Agent Yi were unsubstantiated and too dissimilar from the allegations in plaintiff's complaint to constitute evidence of intent or absence of mistake under Rule 404(b). It was therefore neither clearly erroneous nor contrary to law for Magistrate Judge Kay to deny plaintiff's motion to compel, and plaintiff's objections are overruled.

## CONCLUSION

Accordingly, defendants' motion for summary judgment is granted.  An Order accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 27, 2016